**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **FRANCIS HUBBARD,** | |
| **Plaintiff,** | |
| **v.** | |
| **JEFFERSON COUNTY BOARD OF COUNTY COMMISSIONERS,** | **Civ. No.: 16-CV-02444-JWL/KGG** |
| **Defendant.** | |

## DEFENDANT JEFFERSON COUNTY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This is an employment dispute arising out of the termination of the employment of Francis Hubbard, a long-time at-will employee of Jefferson County. Hubbard accuses the county of age discrimination because his employment of nearly 18 years was terminated shortly after Bill Noll became his new supervisor as the county's Public Works Director. The county's termination of Hubbard's employment was based on legitimate, nondiscriminatory reasons. In particular, Hubbard was insubordinate to his new supervisor, bullied other employees with rough language, and failed to complete his job according to the direction of his new supervisor. Hubbard has no direct evidence of age discrimination but alleges that the new supervisor asking Hubbard—and many other employees—about potential retirement plans indicates that he was fired because of his age. Hubbard provides no other evidence to show that the county's reasons were pretextual. Because Hubbard cannot prove he was terminated because of his age, the county is entitled to summary judgment as a matter of law.

1

## II.     STATEMENT OF MATERIAL FACTS

1.  Francis "Babe" Hubbard was hired by Jefferson County as a grader operator in 1996. [Ex. A, Hubbard Deposition at 13] Hubbard understood from the time he was first hired that the county could terminate his employment at any time. [Ex. A, Hubbard Deposition at 22-23]

2.  Hubbard was promoted to road and bridge foreman in 2005 and to road and bridge superintendent in 2008. [Ex. A, Hubbard Deposition at 27-28]

3.  From 2008 to 2014, Hubbard was the road superintendent and oversaw the county road and bridge department for Jefferson County. [Ex. B, Noll Deposition at 168]

4.  When Hubbard was promoted in 2008, he signed an acknowledgment that he was an at-will employee who could be discharged at any time with or without cause. [Ex. A, Hubbard Deposition at 32] The acknowledgment also indicated that the at-will relationship couldn't be changed without written authorization by a county executive. [Ex. A, Hubbard Deposition at 34]

5.  In August 2013, Jefferson County revised its employee handbook. [Ex. A, Hubbard Deposition at 37]

6.  The employee handbook included an equal employment opportunity policy that stated the county's non-discrimination policy, which included a policy against age discrimination and an employee's right to file a complaint according to the complaint procedure. [Ex. A, Hubbard Deposition at 38]

7.  The employee handbook also included a work place standards policy. The county set a standard that "employees should maintain a positive work atmosphere by acting and

communicating in a manner so that you get along with customers, clients, co-workers and management." This standard also prohibited disorderly conduct in the way of "use of vile, offensive, obscene, or abusive language or gestures, or engaging in noisy conduct that might cause alarm or anger to other patrons or employees." [Ex. A, Hubbard Deposition at 39-40; Ex. C, County Policy]

8.  The employee handbook additionally included a provision concerning dismissal. The handbook provision stated, "An employee may be dismissed at any time, for any reason, at the sole and absolute discretion of the County. In the case of dismissal, the County may, in its sole discretion, give some notice of its intent to dismiss an employee, but the County is not required to give any such notice." [Ex. A, Hubbard Deposition at 40; Ex. C, County Policy]

9.  On August 28, 2013, Hubbard signed an acknowledgment that he had been advised that the updated employee handbook was available and that it was his responsibility to read and comply with these policies. [Ex. A, Hubbard Deposition at 35-36]

10. Hubbard testified that at some point he asked the county commissioners if he could step down from road superintendent because of health issues. [Ex. A, Hubbard Deposition at 71] Hubbard accepted an $8,000 pay cut and voluntary demotion to road foreman, effective January 26, 2014. [Ex. A, Hubbard Deposition at 70-71]

11. In January 2014, the Jefferson County Board of County Commissioners named Bill Noll as Public Works Director after he served two years as the county's zoning administrator. The commissioners voted for the promotion on January 13 with the change effective January 26. [Ex. B, Noll Deposition at 15-16]

3

12. The position of Public Works Director was a new position and was created to provide oversight of the county's road and bridge department and the county's auxiliary services department. [Ex. B, Noll Deposition at 16]

13. Jefferson County created the Public Works Director position because the commissioners weren't happy with the production of the road and bridge department and the auxiliary services department. At that time, there was a supervisory void because of Hubbard's request for less responsibility and the departure of the auxiliary services department director. [Ex. B, Noll Deposition at 19]

14. Noll understood from the commissioners that they had concerns about how the road and bridge department had been run. Among the concerns were that the road and bridge department hadn't applied for any grants in five years and that the department was behind schedule in maintaining the county roads. Noll was told there was low morale within the department and that the commissioners wanted more accountability from employees and better interactions with the public. [Ex. B, Noll Deposition at 19-20, 23]

15. Noll's initial priorities for the road and bridge department were to get the department to embrace technology, improve interactions with the public, and generally be more productive. [Ex. B, Noll Deposition at 42] Noll communicated these priorities at departmental meetings of the entire department. [Ex. B, Noll Deposition at 47-48] Specifically, Noll told the department employees that "things were going to change" and emphasized productivity, technology, and accountability. [Ex. B, Noll Deposition at 50]

16. After Noll's promotion, Hubbard's position changed from road superintendent to road foreman, and he reported to Noll rather than reporting directly to the county commissioners. [Ex. A, Hubbard Deposition at 76] Hubbard was still responsible for the day-to-day operations of the road department and interacting with the public, but he no longer had to attend public meetings. [Ex. B, Noll Deposition at 155-156] Hubbard retained supervisory responsibilities over most of the road and bridge department employees. Noll discussed the changes he wanted to see made in the department directly with Hubbard. [Ex. B, Noll Deposition at 55, 58]

17. When Noll became Public Works Director, the county clerk's office alerted Noll that he was going to have a significant turnover in employees—up to a third of the staff—in the next two years because of impending retirements. Noll was advised to check with employees who may be eligible for retirement for long-term planning purposes. [Ex. B, Noll Deposition at 202]

18. At some point in time after assuming duties as Public Works Director, Noll asked Hubbard if he had a set retirement date. [Ex. B, Noll Deposition at 196]

19. Noll named 14 other county employees who he asked if they had a set retirement date. [Ex. B, Noll Deposition at 200-201]

20. Hubbard's testimony was consistent with Noll's account: "I believe Bill had asked me if I intended to retire or what my intentions were on retiring from Jefferson County, or thereabouts." [Ex. A, Hubbard Deposition at 206]

21. Noll began raising concerns with Hubbard's employment with the county commissioners starting in late February or early March 2014. [Ex. B, Noll Deposition at 206, 221-222]

22. Noll documented his concerns in a two-page, eight-paragraph memo describing Hubbard's incompetence and insubordination that led to his termination. [Ex. B, Noll Deposition at 210; Ex. D, Memo] Noll presented a copy of the memo to the commissioners during the April 7 executive session. [Ex. B, Noll Deposition at 232]

23. The first paragraph of the memo described that the road department failed to meet a deadline for licensing narrow-band radios that could have cost the county significant man hours and money. [Ex. D Memo]

24. In Noll's assessment, the licensing issue fell under Hubbard's department and Hubbard should have either stepped in to help the office manager or direct her to complete the licensing from the FCC. [Ex. B, Noll Deposition at 303]

25. Hubbard testified that he was under the impression the narrow-banding had been accomplished on time, but he acknowledged that the existing license was set to expire. [Ex. A, Hubbard Deposition at 177-178]

26. The second paragraph of the memo described Hubbard's attempts to undermine Noll's authority as the new Public Works Director by failing to convey messages from the public and telling people that Noll would do something without Hubbard having any authority to say that. Noll was told by multiple employees that Hubbard made statements to county staff that Noll was recording everything everyone was saying inside the buildings. [Ex. B, Noll Deposition at 359; Ex. D, Memo]

27. Hubbard testified that he didn't know what Noll was referring to in the memo but admitted that he joked about the office being bugged. [Ex. A, Hubbard Deposition at 180-181]

28. The third paragraph of the memo described Hubbard's behavior of being rude and bullying his employees. Noll listed examples of Hubbard's inappropriate interactions, such as referring to employees as "retarded monkeys," "dumb shits," "lazy bastards," "morons," and "crybaby losers." [Ex. D, Memo]

29. Hubbard acknowledged that he used rough language on the job. He testified that he "made reference to one employee that he looked like a retarded monkey when he was swinging from an excavator in a security—or a harness while doing a job one time." [Ex. A, Hubbard Deposition at 182] He acknowledged that he had addressed employees as "you dumb shit" and "you moron." He testified that there was "a lot of cursing" in the road department and that he used the terms "fuck" and "fucking" with employees. He agreed that that was the type of language he used on the job. [Ex. A, Hubbard Deposition at 182-183, 187]

30. In the memo, Noll also related an incident when Noll overheard Hubbard telling a new employee on the employee's first day, "Hey you son-of-a-bitch why the fuck aren't you answering your god damn phone I've been trying to fucking call you." [Ex. D, Memo]

31. Hubbard testified that he recalled the incident, estimating that it happened April 1. He agreed that he used language like this in the new employee's presence and agreed that

the employee and Noll could have gotten the impression that he was talking directly to the new employee. [Ex. A, Hubbard Deposition at 184-186]

32. When Noll confronted Hubbard about this, Noll documented that Hubbard responded, "If you had a problem why didn't you fucking come in there and say something." Noll documented that he told Hubbard that he was not going "to be baited into a fight with the entire staff present to watch." Hubbard walked away while Noll attempted to address him. [Ex. D, Memo]

33. Hubbard testified that he didn't remember the confrontation, but he remembered leaving for lunch after the incident involving the new employee. [Ex. A, Hubbard Deposition at 187-188]

34. Noll testified that multiple employees reported that Hubbard bullied them. In particular, Noll said that Mark Hulse "stated he had never been treated so poorly or been bullied in any way by another man such as Babe Hubbard." Noll named eight employees who discussed Hubbard's bullying behavior with Noll. Noll said he witnessed Hubbard's bullying on multiple occasions. [Ex. B, Noll Deposition at 360-361]

35. The fourth paragraph of the memo described Hubbard's failure to follow Noll's direction to stockpile enough chip rock to chip and seal 50 miles of road. Hubbard had told the quarry that the county would need 3500 tons, but Noll told Hubbard that he wanted to stockpile 6000 tons so that the county trucks could access chip rock without delay. A week later, Noll asked Hubbard if he had stockpiled more chip rock. Hubbard told Noll that he wasn't going to haul any more gravel and that Noll was

wasting his time. Further, Hubbard told Noll that he was going to do things his way. When Noll told Hubbard that he had to deal with the way Noll wanted things done, Hubbard responded that that wasn't the agreement he had made with the county commissioners. [Ex. D, Memo]

36. The commissioners had told Noll that chip and sealing was one of their highest priorities. Testing revealed that the highest-traveled road in Jefferson County had been chip and sealed once in the past 20 years when it should have been on a three-year maintenance cycle. [Ex. B, Noll Deposition at 375] The commissioners requested that Noll put together a three-year plan for chip and sealing 50 of the 154 miles of asphalt roads in the county each year. [Ex. B, Noll Deposition at 376, 379]

37. Hubbard testified that he recalled having a conversation about chip rock and discussing with Noll that Hubbard would have to deal with what Noll wanted him to complete. [Ex. A, Hubbard Deposition at 189-192]

38. The fifth paragraph described Hubbard's further insubordination related to road work. According to the memo, Noll asked Hubbard to give him a schedule of what work was planned at least a week in advance. Hubbard said he wasn't going to produce any schedule because Hubbard wasn't having "your buddies the bastard commissioners interfering in his plans." Hubbard again told Noll that Hubbard believed that he should be left alone to run the road department his way. Noll told Hubbard that he expected to have the information so that Noll could do his job as Public Works Director. [Ex. D, Memo]

39. Hubbard testified that he remembered the conversation but said he was fired before he could put together a schedule. [Ex. A, Hubbard Deposition at 198] Hubbard explained that he did not believe in posting schedules in advance because workers may take time off if they did not like what they were scheduled for that day. [Ex. A, Hubbard Deposition at 193]

40. Regarding the statement about "the bastard commissioners," Hubbard testified that he may have said "words to that effect." He remembered referring to the commissioners as Noll's "buddies" and didn't deny that he used language such as "bastard commissioners." Hubbard confirmed that he remembered telling Noll that Hubbard thought Noll would deal with the commissioners and that Hubbard was going to be left alone to run the road department. [Ex. A, Hubbard Deposition at 192-194]

41. According to the memo, Noll asked Hubbard if he wanted to take another demotion so that Hubbard wouldn't have to do the managerial work that Noll expected the person in Hubbard's position to do. Noll told Hubbard that Hubbard couldn't stay in the position he had if he didn't want to produce the schedules that Noll wanted. Hubbard said he didn't want to take another pay cut and withdrew from the conversation. [Ex. B, Memo]

42. About this conversation, which occurred sometime in March, Noll testified: "I asked him whether he intended to complete any of the things that I was going to require because he could not work in his capacity as—as the road foreman, as a supervisor of the department—without providing me this documentation. I said, you know, I made it very straightforward that he would be terminated if this is the direction he intended

on taking." [Ex. B, Noll Deposition at 378, 381] Noll testified that Hubbard "was just completely unresponsive to any coaching or direction even with the threat of termination at that point." [Ex. B, Noll Deposition at 382]

43. Hubbard testified that Noll said "it sounds like all you want to do is run equipment," but Hubbard didn't interpret it as an offer to take another position. [Ex. A, Hubbard Deposition at 195-196] Hubbard said he didn't remember being told he couldn't be the road foreman if he didn't produce the schedules Noll wanted. Hubbard testified this conversation may have been at the end of a workday right before he left for home. [Ex. A, Hubbard Deposition at 196-197]

44. The sixth paragraph of the memo described Hubbard's unwillingness to follow Noll's direction regarding money available through the Kansas Exchange Fund Program that nearly cost the county $200,000 in state aid. When Noll learned more about the program, he asked Hubbard to verify the information. Hubbard didn't call anyone about the program and said that taking money from the program just meant a bunch of red tape. [Ex. D, Memo]

45. Hubbard testified that he remembered Noll asking him why he hadn't participated in the program in the past, and Hubbard agreed that he may have said that there was a bunch of red tape to go through to participate in the program. He testified that he didn't remember being asked to verify information, but he remembered contacting an engineering firm about the program. [Ex. A, Hubbard Deposition at 200-203]

46. The seventh paragraph of the memo further described Hubbard's insubordinate attitude toward Noll's new initiatives as Public Works Director. Noll asked Hubbard

why he hadn't applied for any federal grants. Hubbard responded that it was all "red tape bull shit" and that he wasn't going to participate in the process to apply for funding in the future. [Ex. D, Memo]

47. Noll testified that Hubbard refused to provide information that could be used to apply for grants. Hubbard told Noll that he wouldn't participate in the future, "it was all a bunch of bullshit," the county couldn't afford it, and that Noll didn't understand the grant process. [Ex. B, Noll Deposition at 386-387]

48. Hubbard testified that he didn't remember that conversation. [Ex. A, Hubbard Deposition at 203]

49. The decision to terminate Hubbard's employment was made during an executive session with the county commissioners April 7. [Ex. B, Noll Deposition at 207, 232]

50. Noll informed Hubbard of the decision to terminate his employment the next day, April 8. [Ex. B, Noll Deposition at 214-215]

51. The local newspaper, the Oskaloosa Independent, interviewed Hubbard for two articles published April 17 and April 24. [Ex. A, Hubbard Deposition at 140]

52. In the April 17 article, the newspaper reported that Hubbard "supplied the paper with the names of three other employees, Kevin Wynkoop, Don Wright and Allen Lowrance, who, according to him, also have been terminated in recent weeks." [Ex. E, Newspaper Articles]

53. Hubbard testified that he didn't know for sure why Wynkoop, Wright, and Lowrance were terminated. [Ex. A, Hubbard Deposition at 151-154]

54. Lowrance's employment was terminated February 27. Lowrance was a mechanic in the auxiliary services department. [Ex. B, Noll Deposition at 401]

55. Hubbard testified that one day Noll told him Noll was going to fire Lowrance, and Lowrance was fired the same day. But Hubbard testified that he didn't know the reason and didn't know anything else about Lowrance's termination. [Ex. A, Hubbard Deposition at 154]

56. Noll testified that Lowrance's employment was terminated after an ambulance mechanical failure jeopardized a citizen's life. Noll testified that it was documented that Lowrance had stated that repairs had been made to the ambulance, but none of the parts actually had been replaced or repaired. [Ex. B, Noll Deposition at 401-402]

57. Wynkoop's employment was terminated March 3. [Ex. B, Noll Deposition at 223-224]

58. Hubbard testified that he believed Wynkoop was terminated for receiving a DUI. [Ex. A, Hubbard Deposition at 150]

59. Wright's employment was terminated by the clerk's office. [Ex. B, Noll Deposition at 399]

60. Hubbard testified that he knew that Wright had been off work for a long time due to health reasons. [Ex. A, Hubbard Deposition at 152]

61. Noll testified that he wasn't involved in Wright's termination. Noll testified that his understanding was that the county considered Wright to have abandoned his employment after a long leave. Noll testified that Wright was on FMLA leave for approximately 20 weeks but failed to provide required documentation to extend his

leave. After 20 weeks, the clerk's office sent Wright a letter seeking a doctor's note to document that he had a continued need for medical leave. Wright never responded and never once reported to Noll. [Ex. B, Noll Deposition at 399-400]

62. In the April 24 article, the newspaper characterized Hubbard's dismissal as part of a "general shakeup" in the road and bridge department. The newspaper reported that Hubbard said he understood that his job was vulnerable because of the political nature of his position. [Ex. E, Newspaper Articles]

63. The newspaper didn't report any allegation of age discrimination in either article. [Ex. E, Newspaper Articles]

64. The road foreman position wasn't filled directly. Hubbard's duties were redistributed among Noll and three other employees. [Ex. B, Noll Deposition at 237-239, 242]

65. Hubbard filed this lawsuit in 2016. In the Complaint, Hubbard alleged that shortly after Noll became Public Works Director Noll "began asking employees when they intended to retire or how long they intended to stay in their positions." Hubbard also alleged that "several older, long-term employees were either forced to retire or were terminated from their positions." [ECF Doc. 1, Complaint at ¶¶ 19-20]

66. In his deposition, Hubbard was asked for anything whatsoever that leads him believe that the county terminated his employment because of his age. Hubbard testified:

> I believe Bill had asked me if I intended to retire or what my intentions were on retiring from Jefferson County, or thereabouts. And I heard from other employees that he was referencing also retirement dates or how long you intend to work there before you retire or if you're tired of your job. . . . I believe after I was terminated, after they had put the ad in the paper for another Road Superintendent, that that position was offered or taken by a younger person. [Ex. A, Hubbard Deposition at 205-07]

14

67. Hubbard testified he had no other reason to believe he was terminated because of age. [Ex. A, Hubbard Deposition at 208-209]

68. During his deposition, Hubbard identified Debbie Miller, Gary Thoma, and George Pentlin as other employees that he believed Noll asked about retirement dates. [Ex. A, Hubbard Deposition at 206]

69. Miller's employment was terminated March 25 for similar reasons as Hubbard, i.e. insubordination and inability to adapt to Noll's leadership. [Ex. B, Noll Deposition at 208-209]

70. Pentlin died while he was a county employee in the summer of 2014. Pentlin was off work on FMLA leave for a substantial amount of time with a broken leg and later died of a heart attack before returning to work. [Ex. B, Noll Deposition at 246-247]

### III. ARGUMENTS AND AUTHORITIES

#### A. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" about "any material fact" exists and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.*

For the moving party to meet its burden, it "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002). Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* (quoting Fed. R. Civ. P. 1).

## B.     Legal framework

Hubbard asserts that Jefferson County terminated his employment because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. 621-634, and the Kansas Age Discrimination in Employment Act, K.S.A. 44-1111 to 1121.[1] Under the ADEA, if a plaintiff has no direct evidence of discrimination, his claim is analyzed using the *McDonnell Douglas* burden-shifting framework. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *Id*. To establish a prima facie case of discrimination, a plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id*. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If the defendant meets this burden, summary judgment against the plaintiff is warranted unless he introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*.

Ultimately, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009). A plaintiff must prove by a preponderance of the evidence that age was the "but-for" cause of the challenged employer decision. *Id*. at 177-78. "In other words, the employee's age must have been 'the factor that made a difference' in the employer's decision." *Johnston v. Mini Mart, Inc.*, 675 Fed App'x 825, 828 (10th Cir. 2017). "This causal link 'must be based on more than mere speculation, conjecture, or surmise.'" *Id*.

---

[1] Kansas courts use the ADEA's burden-shifting framework and authority to analyze KADEA claims. *See Beech Aircraft Corp. v. Kan. Human Rights Comm'n*, 254 Kan. 270, 272-73 (1993). The Court applies federal authority without distinction. *See Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1192 n.8 (D. Kan. 2016).

### 1. No direct evidence of discrimination

As an initial matter, Hubbard does not have direct evidence of age discrimination. The basis for his claim is that Public Works Director Bill Noll asked Hubbard when he planned to retire. When asked about what led him to believe he was terminated because of age, Hubbard testified:

> I believe Bill has asked me if I intended to retire or what my intentions were on retiring from Jefferson County, or thereabouts. And I heard from other employees that he was referencing also retirement dates or how long you intend to work there before you retire or if you're tired of your job. . . . I believe after I was terminated, after they had put the ad in the paper for another Road Superintendent, that that position was offered or taken by a younger person.

Hubbard Deposition at 206:5-207:1.

In determining whether a statement should be considered direct or circumstantial evidence, the Tenth Circuit has said that "a statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Anderson v. Cato Corp.*, 444 Fed. App'x 280, 283 (10th Cir. 2011). Here, the statement attributed to Noll can be interpreted as a benign inquiry into Hubbard's future employment plans for the purpose of long-term planning in the department. The Tenth Circuit has observed that "many courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees." *Maughn v. Alaska Airlines, Inc.*, 281 Fed. App'x 803, 807 (10th Cir. 2008); *see also Haggenmiller v. ABM Parking Services, Inc.*, 837 F.3d 879, 887 (8th Cir. 2016) ("Reasonable inquiries into retirement are 'not inherently discriminatory.'"). Because the statement attributed to Noll can be interpreted two different ways, it must be considered circumstantial evidence. As a result, Hubbard's claim is analyzed through the *McDonnell Douglas* burden-shifting framework.

## 2. Hubbard's termination was for a legitimate, nondiscriminatory reason

Assuming Hubbard may make a prima facie case, the court turns to whether the employer has met its burden to articulate a legitimate, nondiscriminatory reason for termination. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011). Here, the county has uncontroverted evidence to show that Hubbard's insubordination, incompetence, and inability to adapt to new leadership caused his employment to be terminated. In short, Hubbard was a long-time employee who failed to follow the direction of his new supervisor, and the county had every right to terminate his employment. The uncontroverted reasons for Hubbard's termination are legitimate, not based on age discrimination, and require no assessment of credibility.

To summarize, Hubbard was an at-will employee who violated county policy by often using offensive and abusive language directed to other employees on the job. SOF ¶ 7, 28-34. Noll supervised Hubbard for more than two months and documented multiple instances of performance and attitude problems. SOF ¶ 22-47. In addition to regularly using offensive and abusive language with employees, eight employees reported that Hubbard bullied them on the job. SOF ¶ 34. Hubbard failed to complete work, such as getting the road department radios licensed on time. SOF ¶ 23-24. And he failed to follow the direction of Noll, his new boss. For example, when Noll told Hubbard to stockpile more gravel to have on hand during chip-and-seal season, Hubbard didn't do it and told Noll he wasn't going to do it. SOF ¶ 35-37. During the same conversation, Noll told Hubbard to provide him with a schedule of road work a week in advance, and Hubbard failed to do so. SOF ¶ 38-39. Even when Noll warned Hubbard that he would be terminated if he didn't comply, Hubbard didn't budge. SOF ¶ 42. Noll testified that

Hubbard "was just completely unresponsive to any coaching or direction even with the threat of termination at that point." SOF ¶ 42.

Hubbard's insubordination wasn't limited to one incident. Noll, acting at the direction of the county commissioners, wanted to take advantage of funds available through the Kansas Exchange Fund Program and federal grant programs. Again, Hubbard expressed disagreement with Noll over the county's direction, refused to participate in the process, and even refused to provide information that Noll needed to apply for grants. SOF ¶ 44-47. The burden on the employer to produce a legitimate, nondiscriminatory reason for termination is "exceedingly light." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011). Any one of the incidents documented by Noll was a legitimate reason for Hubbard's termination.

**3. Hubbard has no evidence that the county's reasons for termination are merely pretext for age discrimination**

Because the county has produced legitimate and nondiscriminatory reasons for Hubbard's termination, the burden of proof shifts back to Hubbard to show that the county's reasons are pretextual. Generally, a plaintiff shows pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *McDonald-Cuba v. Santa Fe Protective Servs., Inc.*, 644 F.3d 1096, 1102 (10th Cir. 2011). In determining whether the proferred reason is pretextual, the court examines "the facts as they appear *to the person making the decision*, not as they appear to the plaintiff." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (emphasis in original). The

court doesn't "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith" on those beliefs. *Id*. A plaintiff "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010). That's because courts are charged to redress discriminatory decisions, "not to act as a 'super personnel department' to undo bad employment decisions." *Id*.

As noted earlier, the basis of Hubbard's personal belief that he was fired because of his age is limited to Noll asking him and others about retirement and being replaced by a younger person. SOF ¶ 66-67. The Tenth Circuit has regarded a comment about retirement plans as a "stray remark," and stray remarks are insufficient to support a finding of pretext. *See Kirkpatrick v. Pfizer, Inc.*, 391 Fed. App'x 712, 719-20 (10th Cir. 2010) (quoting *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994); *Carter v. Newman Memorial County Hosp.*, 49 Fed. App'x 243, 246 (10th Cir. 2002). Other courts agree that questions about retirement, standing alone, are not evidence of discriminatory intent. *See, e.g., Haggenmiller*, 837 F.3d at 887 (noting that reasonable inquiries into retirement aren't inherently discriminatory as long as they aren't unnecessary and excessive); *Killingsworth v. State Farm Mut. Auto. Ins. Co.*, 254 Fed App'x 634, 637 (9th Cir. 2007) (noting that employer has legitimate business interest in knowing plans of its retirement-age employees in order to plan for its own future); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (finding employer entitled to inquire about whether retirement rumors true); *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 816 (5th Cir. 1993) (stating that a new supervisor may inquire about retirement plans of employees to "gauge the anticipated

longevity of [the] crew"); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.").

In particular, this Court has granted summary judgment in favor of an employer who asked an employee about retirement plans. *See Robertson v. Waddell & Reed, Inc.*, No. 07-2163-JWL, 2008 WL 2549034 (D. Kan. June 23, 2008) (unpublished). In *Robertson*, a supervisor asked a department manager, "What are your plans? What are you thinking about doing? Are you going to retire?" *Id.* at *4. The supervisor asked again two months later. In neither conversation did the supervisor make any statements to suggest that plaintiff should consider retirement, and the supervisor testified that he asked because they were talking about long-term planning for the department. *Id.*

In analyzing whether sufficient evidence of pretext existed in that case, this Court concluded that these two retirement inquiries weren't sufficient to create a reasonable inference of discrimination in opposition to a motion for summary judgment. *Id.* at *5. This Court based its decision on the requirement that a plaintiff "must demonstrate a nexus between the allegedly ageist comments and the termination decision." *Id.* (citing *Cone*, 14 F.3d at 531). Further, "questions about an employee's retirement plans, standing alone, are generally insufficient to support an inference of age discrimination." *Id.* This Court found that the employee didn't show that the supervisor's questions were related to the termination and concluded that the evidence wasn't sufficient to withstand summary judgment. *Id.*

Here, the Court should reach the same result. When given the opportunity, Hubbard offered no other evidence of age discrimination. In his own words—"I believe Bill has asked me

if I intended to retire or what my intentions were on retiring from Jefferson County"—Hubbard doesn't attribute any expressly age-related statement to Noll or anyone with the county. SOF ¶ 66-67. Hubbard's personal belief that he was fired because of his age is rank speculation. But an age-discrimination claim "must be based on more than mere speculation, conjecture, or surmise." *Johnston*, 675 Fed. App'x at 828. Nothing in the record reflects that Noll had a negative view of Hubbard's age or retirement eligibility, or that his age or retirement status negatively affected the county. And nothing about Noll's statement—in Hubbard's own words— suggests that he thought Hubbard should consider retirement. In short, no reasonable jury could conclude from Noll asking Hubbard on one occasion about his retirement plans that therefore the county terminated Hubbard's employment based on his age, especially in light of abundant evidence of Hubbard's insubordination and performance issues.

Hubbard also suggests that Noll asking other employees about retirement plans supports his claim of age discrimination. In fact, Noll readily testified that he asked 14 other people— many more than the three Hubbard named—about retirement plans when he took over as Public Works Director. SOF ¶ 17-19. This is consistent with department-wide long-term planning as was suggested by the county clerk's office. Hubbard identified three employees that he believed were terminated by Noll and three others who he believed were asked about retirement. SOF ¶ 52-53, 68. But Hubbard didn't attribute any termination of employment to unlawful age discrimination and admitted he didn't know why they were no longer employed by the county. SOF ¶ 53. The fact that three other employees were fired for cause, another employee retired, one more died, and another abandoned his employment does not support an inference that age discrimination made a difference in Hubbard's termination. *See* SOF ¶ 54-61, 69-70.

Further, even viewing the record in a light favorable to Hubbard, there is no evidence that the county's reasons for the termination are unworthy of credence. In particular, Hubbard agreed that he used rough language in the workplace, including calling one employee a "retarded monkey" and referring to other employees as "you dumb shit" and "you moron." SOF ¶ 29. Hubbard confirmed that he told Noll that Hubbard thought he should be left alone to run the road department his way. SOF ¶ 40. Hubbard agreed he had differences of opinion with Noll, specifically regarding stockpiling rock, scheduling road work in advance, and applying for federal funds. But a subjective difference of opinion about work tasks does not render Noll's documented reasons as unbelievable. Hubbard may not remember his conversations with Noll or remember them in the same way, but he does not have contradictory evidence that they did not happen. All that matters is that Noll believed the reasons he had for terminating Hubbard's employment. *See Debord*, 737 F.3d at 655. Hubbard does not have evidence that Noll did not really believe his reasons for termination. *See Weld County*, 594 F.3d at 1211. Ultimately, Hubbard has no evidence that age played a part in the county's decision and certainly no evidence that age was the but-for factor that made the difference in the decision to terminate his employment. *See Mini Mart*, 675 Fed. App'x at 828.

## IV.    CONCLUSION

For these reasons, Hubbard has failed to come forward with evidence of pretext sufficient for a jury to conclude that the county's reasons for termination are unworthy of belief. Therefore, summary judgment should be granted in Jefferson County's favor on Hubbard's claims.

Respectfully submitted,

FOULSTON SIEFKIN LLP

By: */s/ Vaughn Burkholder*
 Vaughn Burkholder, KS #11458

Eric Turner, KS #25065
32 Corporate Woods, Suite 600
9225 Indian Creek Parkway
Overland Park, KS 66210-2017
(913) 498-2100
(913) 498-2101 FAX
vburkholder@foulston.com
eturner@foulston.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2017, I electronically filed the above and foregoing Notice of Service with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

 Kathryn S. Rickley
 Matthew E. Osman
 OSMAN & SMAY LLP
 8500 W. 110th St., Ste. 330
 Overland Park, KS 66210
 krickley@workerwagerights.com
 mosman@workerwagerights.com

     */s/ Vaughn Burkholder*
     ATTORNEY FOR DEFENDANT